## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MICHAEL CHIECKO, ELI MOND, ELENA RAMOS, ALVIN SAINI and JOHN SUDOLSKY, On Behalf of Themselves And All Others Similarly Situated, | **Civil Action: 08-CV- 01206** |
| Plaintiffs, | |
| vs. | |
| MORGAN STANELY & CO., INCORPORATED, THE INVESTMENT COMMITTEE OF MORGAN STANLEY 401(k) PLAN, THE MORGAN STANLEY GLOBAL DIRECTOR OF HUMAN RESOURCES, WALID A. CHAMMAH, CHARLES CHASIN, ZOE CRUZ, RICHARD PORTOGALLO, JAMES P. GORMAN, NEAL A. SHEAR, CORDELL G. SPENCER, and JOHN DOE DEFENDANTS 1-30, | |
| Defendants. | |

## CLASS ACTION COMPLAINT
## FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT
## INCOME SECURITY ACT ("ERISA")

Plaintiffs, are participants in the Morgan Stanley 401(k) Plan ("401(k) Plan") and the

Morgan Stanley Employee Stock Ownership Plan ("ESOP Plan") (collectively, the "Plan")

covering substantially all employees of Morgan Stanley & Co., Incorporated and its subsidiaries

(collectively "MS&Co." or the "Company"), individually and on behalf of all others similarly

situated (the "Participants"), alleges as follows:

## INTROUCTION

1.      This is a class action brought pursuant to § 502 of ERISA, 29 U.S.C. § 1132, against the Plan's fiduciaries, including MS&Co., on behalf of Participants in and beneficiaries of the Plan.

2.      Throughout the Class Period (December 1, 2005 to the present), the Plan invested in MS&Co. common stock ("MS&Co. Stock" or "Company Stock"), which was offered as one of the investment alternatives in the Participant Contribution Component of the Plan.

3.      Plaintiffs' claims arise from the failure of Defendants, who are Plan fiduciaries, to act solely in the interest of the Participants and beneficiaries of the Plan, and to exercise the required skill, care, prudence, and diligence in administering the Plan and the Plan's assets during the Class Period, as is required by ERISA.

4.      Specifically, Plaintiffs allege in Count I that Defendants breached their fiduciary duties to Plaintiffs in violation of ERISA by failing to prudently and loyally manage the Plan's investment in MS&Co. Stock by continuing to offer Company Stock as an investment option, and to make contributions in Company Stock, instead of suitable short-term options within the Plan, when the stock no longer was a prudent investment for Participants' retirement savings.  In Count II, Plaintiffs allege that Defendants who communicated with Participants regarding the Plan's assets, or had a duty to do so, failed to provide Participants with complete and accurate information regarding MS&Co. Stock sufficient to advise Participants of the true risks of investing their retirement savings in Company Stock.   In Count III, Plaintiffs allege that Defendants, responsible for the selection, removal, and, thus, monitoring of the Plan's fiduciaries, failed to properly monitor the performance of their fiduciary appointees and remove and replace those whose performance was inadequate.   In Count IV, Plaintiffs allege that

Defendants breached their duties and responsibilities to avoid conflicts of interest and serve the interests of the Participants in and beneficiaries of the Plan with undivided loyalty. In Count V, Plaintiffs allege that Defendants breached their duties and responsibilities as co-fiduciaries in the manner and to the extent set forth in the Count. Finally, in Count VI, Plaintiffs state a claim against MS&Co. for knowing participation in the fiduciary breaches alleged herein.

5.      This action is brought on behalf of the Plan and seeks losses to the Plan for which Defendants are personally liable pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109 and 1132(a)(2). In addition, under § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), Plaintiffs seek other equitable relief from Defendants, including, without limitation, injunctive relief and, as available under applicable law, constructive trust, restitution, and other monetary relief.

6.      As a result of Defendants' fiduciary breaches, as hereinafter enumerated and described, the Plan has suffered substantial losses, resulting in the depletion of millions of dollars of the retirement savings and anticipated retirement income of the Plan's Participants. Under ERISA, the breaching fiduciaries are obligated to restore to the Plan the losses resulting from their fiduciary breaches.

7.      Because Plaintiffs' claims apply to the Participants and beneficiaries as a whole, and because ERISA authorizes Participants such as Plaintiff to sue for plan-wide relief for breach of fiduciary duty, Plaintiffs bring this as a class action on behalf of all Participants and beneficiaries of the Plan during the Class Period. Plaintiffs also bring this action as a participant seeking Plan-wide relief for breach of fiduciary duty on behalf of the Plan.

8.      In addition, because the information and documents on which Plaintiffs' claims are based are, for the most part, solely in Defendants' possession, certain of Plaintiffs'

allegations are by necessity upon information and belief.  At such time as Plaintiffs have had the opportunity to conduct additional discovery, Plaintiffs will, to the extent necessary and appropriate, further amend the Complaint, or, if required, seek leave to amend to add such other additional facts as are discovered that further support each of the following Counts below.

## JURISDICTION AND VENUE

9.    *Subject Matter Jurisdiction*.  This is a civil enforcement action for breach of fiduciary duty brought pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a).  This Court has original, exclusive subject matter jurisdiction over this action pursuant to the specific jurisdictional statute for claims of this type, ERISA § 502(e)(l), 29 U.S.C. § 1132(e)(l).  In addition, this Court has subject matter jurisdiction pursuant to the general jurisdictional statute for "civil actions arising under the . . . laws . . . of the United States."  28 U.S.C. § 1331.

10.    *Personal Jurisdiction*.  ERISA provides for nation-wide service of process, ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).  All of Defendants are residents of the United States, and this Court therefore has personal jurisdiction over them.  This Court also has personal jurisdiction over them pursuant to Fed. R. Civ. P. 4(k)(l)(A), because they all would be subject to the jurisdiction of a court of general jurisdiction in the Southern District of New York.

11.    *Venue*.  Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan was administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, and/or some Defendants reside or maintain their primary place of business in this district.

## PARTIES

**Plaintiffs**

12.    **Plaintiff Michael Chiecko** is a resident of New York.  Plaintiff is a former MS&Co. employee and is a participant in the 401(k) Plan.  In addition, Plaintiff is also a participant in the ESOP Plan.

13.    **Plaintiff Eli Mond** is a resident of New York.  Plaintiff is a former MS&Co. employee and is a participant in the ESOP Plan.

14.    **Plaintiff Elena Ramos** is a resident of New Jersey.  Plaintiff is a former MS&Co. employee and is a participant in the 401(k) Plan.  In addition, Plaintiff is also a participant in the ESOP Plan.

15.    **Plaintiff Alvin Saini** is a resident of New York.  Plaintiff is a former MS&Co. employee and is a participant in the 401(k) Plan.

16.    **Plaintiff John Sudolsky** is a resident of New York.  Plaintiff is a former MS&Co. employee and is a participant in the 401(k) Plan.  In addition, Plaintiff is also a participant in the ESOP Plan.

**Defendants**

17.    **Defendant MS&Co.** is a global financial services firm that, through its subsidiaries and affiliates, provides its products and services to a large and diversified group of clients and customers, including corporations, governments, financial institutions and individuals.

18.    Throughout the Class Period, MS&Co.'s responsibilities included, along with its officers, directors and executives, broad oversight of and ultimate decision-making authority respecting the management and administration of the Plan and the Plan's assets, as well as the appointment, removal, and, thus, monitoring of other fiduciaries of the Plan that it appointed, or

to whom it assigned fiduciary responsibility. Throughout the Class Period, the Company exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

19.     *Defendant Morgan Stanley Global Director of Human Resources (the "Global Director" or "Plan Administrator")*, was the administrator of the Plan at all relevant times during the Class Period and was responsible for administering and managing the Plan on a day-to-day basis and advising Morgan Stanley and MS&Co.'s Board regarding the Plan and the Plan's assets.  At all times during the Class Period, Defendant Global Director was a "Named Fiduciary" as such term is defined in ERISA § 402(a), with respect to the Plan.

20.     *Defendant Investment Committee of Morgan Stanley 401(k) Plan (the "Investment Committee")* means the Investment Committee of Morgan Stanley 401(k) Plan established to manage the assets of the Trust Fund that holds all the assets of the Plan, which include the assets maintained of the Morgan Stanley Employee Stock Ownership Plan ("ESOP").  Defendant Investment Committee is, upon information and belief, responsible for selecting, monitoring, and evaluating the Plan's investment options.  Defendant Investment Committee consisted of three or more members during the Class Period, each of whom were appointed by and serve at the pleasure of the Board of Directors of MS&Co.  At all times during the Class Period, Defendant Investment Committee was a "Named Fiduciary", as such term is defined in ERISA § 402(a).

21.     *Defendant MS&Co. Board of Directors*.  The Directors who served on the MS&Co. Board of Directors (the "Board") were fiduciaries, because they exercised decision-making authority regarding the appointment of Plan fiduciaries and the management of

the Plan's assets throughout the Class Period. Among other things, the Board determines the annual profit sharing contributions that are made under the Plan. Moreover, MS&Co. acted through the Board in carrying out its Plan-related fiduciary duties and responsibilities, and, thus, members of the Board were fiduciaries to the extent of their personal exercise of such responsibilities.

22. The "Director Defendants" who served on the Board and acted as fiduciaries with respect to the Plan during the Class Period are as follows:

(a)    **Defendant Walid A. Chammah ("Chammah")** is a Managing Director of the Company and Head of Investment Banking at the Company. During the Class Period, defendant Chammah was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

(b)    **Defendant Charles Chasin ("Chasin")** is a Managing Director of the Company and Chief of Staff to Co-President of Morgan Stanley. During the Class Period, defendant Chasin was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

(c)    **Defendant Zoe Cruz ("Cruz")** is a Managing Director, Chairman, Chief

Executive Officer and President of MS&Co. and Co-President of Morgan Stanley. During the Class Period, defendant Cruz was a fiduciary within the meaning of ERISA, because she exercised discretionary authority or discretionary control with respect to the appointment of Plan fiduciaries and with respect to the management of the Plan, she possessed discretionary authority or discretionary responsibility in the administration of the Plan, and she exercised authority or control with respect to the management of the Plan's assets.

(d)      *Defendant Richard Portogallo ("Portogallo")* is a Managing Director of MS&Co., and Regional Co-Head of Americas, Institutional Sales and Trading of Morgan Stanley.  During the Class Period, defendant Portogallo was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

(e)      *Defendant James P. Gorman ("Gorman")* is a Managing Director of MS&Co. and President and COO Global Wealth Management Group of Morgan Stanley. During the Class Period, defendant Gorman was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of

the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

(f)    **Defendant Neal A. Shear ("Shear")** is a Managing Director of MS&Co. and Co-Head of Institutional Sales and Trading at Morgan Stanley.  During the Class Period, defendant Shear was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

(g)    **Defendant Cordell G. Spencer ("Spencer")** is a Managing Director of MS&Co. and Deputy Head of Investment of Morgan Stanley.  During the Class Period, defendant Spencer was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

23.    Unknown Fiduciary Defendants 1-30 are residents of the United States and are or were fiduciaries of the Plan during the Class Period.  These defendants whose identities are currently unknown to Plaintiffs, may include additional MS&Co. employees.  Once their identities are ascertained, Plaintiffs will seek leave to join them under their true names.

<u>**CLASS ACTION ALLEGATIONS**</u>

24.     Plaintiffs bring this action as a class action pursuant to Rules 23(a), (b)(l), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of himself and the following class of persons similarly situated (the "Class"):

> All persons who were participants in or beneficiaries of the Plan at any time between December 1, 2005 to the present (the "Class Period") and whose accounts included investments in MS&Co. Stock.

25.     Plaintiffs meet the prerequisites of Rule 23(a) to bring this action on behalf of the Class because:

26.     **Numerosity**.   The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe there are, at a minimum, over ten thousand members of the Class who participated in, or were beneficiaries of, the Plan during the Class Period.

27.     **Commonality**.  Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     Whether Defendants acted as fiduciaries;

(b)     Whether Defendants breached their fiduciary duties to the Plan, Plaintiffs and members of the Class by failing to act prudently and solely in the interests of the Plan, and the Plan's Participants and beneficiaries;

(c)     Whether Defendants violated ERISA;

(d)     Whether the Plan suffered a loss and, by extension, members of the Class sustained a diminution in vested benefits, and

(d)     What is the proper measure of loss to the Plan and subsequent allocation of vested benefits to the Plan's Participants.

28.     *Typicality*.  Plaintiffs' claims are typical of the claims of the members of the Class because the Plan, the Plaintiffs and the other members of the Class, each sustained a diminution in vested benefits arising out of Defendants' wrongful conduct in violation of federal law as complained of herein.

29.     *Adequacy*.  Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action, complex, and ERISA litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

30.     Class action status in this ERISA action is warranted under Rule 23(b)(l)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

31.     Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (ii) Defendants have acted or refused to act on grounds generally applicable to the Plan and the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (iii) questions of law or fact common to members of the Class predominate

over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## THE PLAN

**The Plan**

32.     The Plan is an "employee pension benefit plan" as defined by §§ 3(3) and (3)(2)(A) of ERISA, 29 U.S.C. §§ 1002(3) and 1002(2)(A).

33.     The Plan is a legal entity that can sue or be sued.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1).

34.     In this action for breach of fiduciary duty, the Plan is neither a plaintiff nor a defendant.  Rather, Plaintiffs request relief for the benefit of the Plan and for the benefit of its Participants.

35.     The Plan is a "defined contribution plan" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each Participant and for benefits based solely upon the amount contributed to the Participants' account, and any income, expenses, gains and losses, and any forfeitures of accounts of other Participants which may be allocated to such Participants' accounts. Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.

36.     The Plan is a voluntary contribution Plan whereby Participants make contributions to the Plan ("Voluntary Contributions") and direct the Plan to purchase investments with those contributions from options pre-selected by Defendants which are then allocated to Participants' individual accounts.

37.    In the Company's most recent filed Form 11-K, dated June 28, 2007, the Plan is described as the following:

> The following summary of the Morgan Stanley 401(k) Plan (the "Plan") is provided for general information purposes only. Participants should refer to the Plan document for more complete information. Terms used in this description have the same meaning as in the Plan.
>
> General--The Plan is a profit-sharing plan that includes a "qualified cash or deferred arrangement" as described in section 401(k) of the Internal Revenue Code of 1986, as amended (the "Code"), and is subject to the provisions of the Employee Retirement Income Security Act of 1974, as amended ("ERISA").
>
> *      *      *
>
> Morgan Stanley & Co. Incorporated (the "Plan Sponsor") is a wholly owned subsidiary of Morgan Stanley (the "Company"). The Plan Sponsor has the authority to control and manage the operation and administration of the Plan, make rules and regulations and take actions to administer the Plan.

## Plan Fiduciaries

38.    ***Named Fiduciaries***.    ERISA requires every plan to provide for one or more named fiduciaries of the plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1002(21)(A).    The person named as the "administrator" in the plan instrument is automatically a named fiduciary, and in the absence of such a designation, the sponsor is the administrator.    ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

39.    ***De Facto Fiduciaries***.    ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under ERISA § 402(a)(1), but also any other persons who in fact perform fiduciary functions.    Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management of disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property

of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

40.    Each of the Defendants was a fiduciary with respect to the Plan and owed fiduciary duties to the Plan and its Participants under ERISA in the manner and to the extent set forth in the governing Plan documents, through their conduct, and under ERISA.

41.    As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1) to manage and administer the Plan -- and the Plan's investments -- solely in the interest of the Plan's Participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

42.    Plaintiffs do not allege that each Defendant was a fiduciary with respect to all aspects of the Plan's management and administration.  Rather, as set forth below, Defendants were fiduciaries to the extent of the specific fiduciary discretion and authority assigned to or exercised by each of them, and, as further set forth below, the claims against each Defendant are based on such specific discretion and authority.

## COMMON FACTUAL ALLEGATIONS

43.    Morgan Stanley joined the Wall Street rush into underwriting pools of securities tied to subprime mortgages, or collateralized debt obligations ("CDOs"), beginning in late 2005. The Company's investment in the subprime mortgage area was spurred in large part by John J. Mack who, when he took his post at Morgan Stanley as Chief Executive Officer in the summer

of 2005, indicated that he would put more of Morgan Stanley's capital at risk in order to garner possibly greater returns.  Beginning in late 2005, Morgan Stanley began to dramatically increase its exposure to credit assets with little or no price transparency.

44.    Acting in line with Mr. Mack's stated determination to take more risk with the firm's capital, Morgan Stanley's 2006 Annual Report, filed with the SEC on February 13, 2007, reported that "on December 4, 2006, Morgan Stanley acquired Saxon Capital, Inc. ("Saxon"), a servicer and originator of residential mortgages," for $706 million.

45.    The acquisition of Saxon, a subprime mortgage underwriter, was intended to gain Morgan Stanley access to subprime mortgages that could be repackaged into complex investment vehicles.  In a press release issued by Morgan Stanley on December 4, 2006, the Company announced that "[t]his acquisition is another important step in our long-term strategy of building a global, vertically integrated residential mortgage business . . .  Saxon adds a premier servicing operation with a scalable U.S. origination platform to our substantial existing residential mortgage franchise."  Armed with Saxon, Morgan Stanley quickly climbed to the No. 1 ranking in subprime-mortgage-securities underwriting in 2007, according to Inside Mortgage Finance, a trade publication in Bethesda, Maryland.

46.    In addition to its acquisition of Saxon, Morgan Stanley took huge positions in super-senior segments of CDOs throughout the Class Period.  The Company held approximately $13 billion worth of the super-senior CDOs at the start of 2007 to hedge and finance its bearish subprime bet.  At first, the CDOs paid a higher interest rate than Morgan Stanley's cost of financing, which generated seductive profits until the bottom fell out in October after more modest declines in August and September.  The bearish subprime bet, which took the form of

derivatives called swaps, required Morgan Stanley to pay interest on those contracts.  To offset the bearish subprime bet and help generate interest income to pay the cost of the swaps, the firm amassed the CDO position that produced most of the losses announced in November

47.     Insiders and directors of Morgan Stanley anticipated carnage from Morgan Stanley's exposure to subprime mortgage investments as far back as 2006, but failed take any action with respect to protecting Plan participants.  Indeed, the Morgan Stanley Board has a risk management panel tasked to oversee these types of credit issues.  That panel, however, and the MS&Co. Board, failed to disclose its findings and concerns to Plan participants though the assets of Plan participants continued to flow into Company Stock.

48.     Morgan Stanley also failed to adequately disclose contingent liabilities associated with Conduits and SIVs.  A SIV is an investment vehicle that earns income through spread lending (*i.e.*, profits from the difference between borrowing short term and investing long term). Generally, a SIV earns income from the purchase of long term high yielding securities, such as mortgage backed securities or credit card receivables, which it turns into marketable securities to be purchased by investors.  These investments are typically funded through the sale of short term lower yielding senior debt (*e.g.,* asset backed commercial paper).

49.     SIVs make payments on the securities in the form of interest to the buyer.  The buyer, in turn, issues commercial paper to raise the funds needed to buy the security.  It is a co-dependant relationship.  If the commercial paper market dries up, nobody buys the SIV's securities and the SW must hold them, technically, they can revert back to the SIV's manager - in this case Morgan Stanley.  What was an off balance sheet expense could quickly return to Morgan Stanley's balance sheet.  Moreover, with many of these securities consisting of subprime

loans, there is a greater chance of default on the underlying asset. Thus, Morgan Stanley will be left on the hook for the security and have no place to sell it.

50.     Given the recent dislocation in financial markets, the cost of commercial paper increased substantially as LIBOR (proxy rate for commercial paper) rose to abnormally high levels. As such, the usually very liquid commercial paper market became illiquid, causing serious funding concerns for SIVs. With the uncertainty of funding for certain SIVs, the assets held by those SIVs may be sold at fire sale prices.

51.     Morgan Stanley SIVs invested in subprime loans and, as a result, many investors are no longer wiling to purchase commercial paper from its SIVs. Because the SIVs still owe money to commercial paper holders, and they can not raise money by selling new commercial paper, they are being forced to sell their assets at fire-sale prices to pay off debts. Consequently, Morgan Stanley SIVs are on the verge of collapse. Moreover, Morgan Stanley may have to move its SIVs onto its balance sheet, and recognize billions of dollars in potential liability that Morgan Stanley had not fairly disclosed to investors in Company Stock, including Plan participants.

52.     Throughout the Class Period, members of Morgan Stanley management issued false and misleading statements and omitted information concerning Morgan Stanley to Plan participants concerning, *inter alia*, (i) Morgan Stanley's exposure to subprime credit, off balance entities, CDO exposure, and other credit-specific problems; (ii) the nature and extent of risk taken by the Company in connection with its investment in subprime mortgages, off-balance entities, and other credit-specific problems; (iii) the aggressiveness of Morgan Stanley's

proprietary trades related to collateralized debt obligations ("CDO"); and (iv) the lack of adequate internal controls to hedge the risks associated with its CDO exposure. Specifically:

53.    On December 19, 2006, Morgan Stanley reported record income from continuing operations for the fourth quarter and full year 2006. The press release stated, in relevant part, as follows:

> The Firm achieved record income from continuing operations for the fiscal year ended November 30, 2006 of $7,497 million, a 44 percent increase from 55,192 million a year ago. Diluted earnings per share from continuing operations were a record $7.09 compared with $4.81 last year. Record net revenues (total revenues less interest expense and the provision for loan losses) of $33.9 billion were 26 percent higher than last year. Non-interest expenses of $22.9 billion were 18 percent above 2005. Compensation expenses increased 27 percent primarily reflecting higher revenues. Non-compensation expenses increased 5 percent as costs associated with higher levels of business activity were partly offset by lower charges for legal and regulatory matters. Results for the current year include an income tax benefit of $280 million, or $0.27 per diluted share, resulting from the outcome of a federal tax audit, while the prior year included a tax benefit of $309 million, or $0.29 per diluted share, related to the provisions of the American Jobs Creation Act. The return on average common equity from continuing operations was 23.6 percent compared with 19.0 percent a year ago.
>
> Income from continuing operations for the fourth quarter was a record $2,206 million, an increase of 26 percent from $1,746 million in the fourth quarter of 2005. Diluted earnings per share from continuing operations were a record $2.08 compared with $1.64 a year ago. Net revenues were $8.6 billion, 24 percent above last year's fourth quarter. Non-interest expenses of $5.8 billion increased 19 percent from last year. The results for the fourth quarters of 2006 and 2005 include the $0.27 and $0.29 per diluted share tax benefits noted above. The annualized return on average common equity from continuing operations was 26.0 percent in the current quarter, compared with 24.9 percent in the fourth quarter of 2005.
>
> Net income (including discontinued operations) for the year was a record $7,472 million, a 5 1 percent increase from $4,939 million a year ago. For the quarter, net income was $2,206 million, compared with $2,465 million in the fourth quarter of 2005, which included an after-tax gain of approximately $700 million related to the sale of the Company's aircraft leasing business. Diluted earnings per share were a record $7.07 for the year compared with

$4.57 a year ago and the return on average common equity was 23.5 percent compared with 17.3 percent last year. For the quarter, diluted earnings per share were $2.08, compared with $2.32 in the fourth quarter of 2005, and the annualized return on average common equity for the fourth quarter was 26.0 percent compared with 34.6 percent a year ago.

54.    Commenting on Morgan Stanley's successful quarter and 2006 fiscal year Mr.

Mack stated, in relevant part, as follows:

2006 was a year of outstanding performance and progress for Morgan Stanley. Capitalizing on a strong market environment, the people of Morgan Stanley achieved record fourth quarter results and the best full-year revenues and earnings in the Firm's history. In our securities business, we delivered powerful performance across our Institutional Securities franchise and made significant strides in our Asset Management and Global Wealth Management businesses.

55.    On March 21, 2007, Morgan Stanley announced its results for the first quarter

ended February 28, 2007. The announcement stated, in relevant part, as follows:

Morgan Stanley (NYSE: MS) today reported record income from continuing operations for the first quarter ended February 28, 2007 of $2,559 million, an increase of 60 percent from $1,602 million in the first quarter of 2006. Diluted earnings per share from continuing operations were a record $2.40 compared with $1.51 a year ago. Net revenues were a record $11.0 billion, 29 percent above last year's first quarter. Non-interest expenses of $7.1 billion increased 17 percent from last year. The annualized return on average common equity from continuing operations was 28.8 percent in the current quarter, compared with 21.9 percent in the first quarter of 2006.

Net income was a record $2,672 million, an increase of 70 percent from $1,574 million in the first quarter of 2006. This quarter's results included an after-tax gain of $109 million reported in discontinued operations related to the sale of Quilter Holdings Ltd. Record diluted earnings per share were $2.51, compared with $1.48 in the first quarter of 2006, and the annualized return on average common equity for the first quarter was 29.9 percent compared with 21.3 percent a year ago.

56.    Commenting on Morgan Stanley's robust first quarter results, Mr. Mack

stated, in relevant part, as follows:

Morgan Stanley delivered outstanding results this quarter – with record revenues and earnings along with ROE of more than 20

percent for the sixth quarter in a row. ***This strong performance was in large part the result of effective, disciplined risk-taking by our team in Institutional Securities, which helped deliver record results across our sales and trading businesses.*** Our Global Wealth Management business this quarter delivered its highest revenues since 2000 and we continued to make substantial progress in executing our growth plan in Asset Management. We see many opportunities to further improve our performance, and remain intensely focused on helping our clients navigate the constantly changing markets and leveraging our global franchise to create additional value for our shareholders.

(Emphasis added).

57.    After the announcement of its first quarter results on March 21, 2007, Morgan Stanley held a conference call to discuss Morgan Stanley's performance. Executive Vice President and Chief Financial Officer David Sidwell represented Morgan Stanley on the call. Regarding Morgan Stanley's position in the subprime mortgage market, Mr. Sidwell stated, in relevant pat, as follows:

Financing products also contributed to the overall increase in revenues. This was a record quarter in prime brokerage, with revenues up substantially on both new accounts and growth in global client balances for the 16th consecutive quarter. In fixed income sales and trading, $3.6 billion in revenues was our best quarter ever, up 57% driven by broad-based strength across credit products, interest rate, and currency products and commodities. We sold very strong trading performance and good levels of client activity across our fixed income businesses. ***Looking at the results by product area, credit products rose 110% to a new record, with the largest increase in securitized products driven by favorable positioning in the Subprime Mortgage Markets, strong customer flows, and robust growth in our Global Commercial Mortgage business . . . .***

***Before I leave Institutional Securities, let me turn to a topic that's been a focus in the market in the past several weeks, subprime mortgage. We participate in the subprime mortgage market in a number of ways. Through our securitized product groups we purchased loans from originators and originate loans, including through Saxon, which closed this quarter. We are active in the structuring, securitization, and distribution of subprime products, including CLOs and CDOs. Third, we manage our risk through a variety of hedging strategies and we also take proprietary risk positions. In the aggregate, these activities were a significant contributor to our results this quarter. In addition, we extend bans and lending commitments***

*to clients that are secured by assets of the borrower such as loan pools.   At the end of the quarter, whereas lending commitments to the subprime lenders totaled $5.2 billion, of which $2.3 billion was funded and fully collateralized.  The largest component of this was the New Century.  Our current funded balance with New Century is $2.5 billion.  Finally, through our acquisition of Saxon, we have servicing capabilities . . . .*

The consumer credit environment in the US. remains very favorable for our business, with bankruptcies remaining low throughout the quarter.  As a result we're revising slightly our outlook for the full year charge-off rate to a range of 4 to 4.5% versus the prior estimate of 4.5 to 5%.  *While there has been considerable media coverage regarding higher delinquencies in the subprime mortgage industry, we have not seen any impact on our Card portfolio.  Nevertheless, we continue to monitor the situation closely.*   In summary, our U.S. business is performing well with growth in usage and receivables and strong credit performance. In the U.K., we're working hard to limit the impact, we are facing due to the adverse credit environment.  Finally, as a regard to outlook, the markets have been very volatile over the last few weeks with a decline in stock markets, widening credit spreads, higher interest rates, and higher volatility as well as concerns which have continued about the subprime market and whether it would spread to other markets.  *At this time we believe this could be a reasonably limited event, as we have not seen any signs that the subprime deterioration could spread to other parts of the market.   At this early point in the second quarter, we remain reasonably optimistic.* I mentioned earlier that our investment banking pipeline across advisory equities of fixed income are strong. The level of client activity in our sales and trading businesses remain strong, with the increase in volatility providing trading opportunities for our clients as well as for us . . . .

(Emphasis added).

58.     During the conference call, Guy Moszkowski of Merrill Lynch asked Mr. Sidwell if Morgan Stanley would consider increasing the amount of subprime origination or alt A type origination, capability that it has, or whether that Morgan Stanley's appetite was already satisfied. Mr. Sidwell responded, in relevant part, as follows:

We had felt as we looked at the firm and its strategy, we felt that we were underrepresented in the mortgage business that our fixed income business, which is a leader in many areas, that we did not have the scale of penetration in the mortgage markets that we should have had.  It was with that, that we have said over the last couple of years that we wanted to increase our footprint in

mortgages, Saxon was part of that as was some of the expansion that we've done overseas. Obviously, I think we will continue to look at opportunities in the marketplace, but it's something that we have at this point made no definitive plans on or else I'd share them with you.

59.    William Tanona of Goldman Sachs also questioned Mr. Sidwell about Morgan

Stanley's subprime strategy, as follows:

**William Tanona - Goldman Sachs**

[I]n terns of mortgages, obviously you've highlighted that as an area of particular strength.  Could you give us a sense as to kind of the contribution of mortgages relative to the fourth quarter as it related to the increased 1% of the increase in thick had been in mortgages?  And then also, could you give us a sense as to what your residuals might look like across mortgage and specifically subprime as it ended the quarter?

**David Sidwell**

I think the major point I've been trying to make, actually, is that if you look at our institutional businesses across equities and fixed income, it was really the breadth of performance compared with the fourth quarter.  So looking at equities, all areas of that business were up, if you look at our fixed income, it's the same thing.  Within fixed income, when going down a little bit, the largest driver of the increase compared with fourth quarter was in credit markets and the residential mortgage business was a big part of that driver. As I gave a rough sizing of it, but I'm not going to break it down further into the actual contribution from that one business.

**William Tanona - Goldman Sachs**

Okay, that's fair and then just on the residuals?

**David Sidwell**

Again, that's part of the overall evaluation of that residential mortgage business, so I'd rather not just address one of the types of instruments that are a part of that overall business strategy, which includes many instruments.

60.    Ron Mendell of DIC also asked Mr. Sidwell about Morgan Stanley's position in

the subprime mortgage market.

**Ron Mendell -- DIC**

Okay. Then in regard to fixed income sales and trading, one thing I was taking away from your comments on the contribution that mortgages made was you took advantage of the volatility and

basically what I took away was that you were short subprime very successfully, and I guess that's possibly going to be very hard to repeat going forward since so much of the activity, although not all of it took place in that quarter.

**David Sidwell**

I actually don't really want to address specifically how we were positioned, but I think the thrust of what you said in terms of the trading and hedging activity, I don't think you want to model that in.

61.    On May 1, 2007, Morgan Stanley issued a press release announcing the planned retirement of Mr. Sidwell as Chief Financial Officer.  The press release also stated that Thomas Cohn Kelleher would succeed Mr. Sidwell as Chief Financial Officer of Morgan Stanley upon Mr. Sidwell's retirement.

62.    On June 20, 2007, Morgan Stanley announced its results for the second quarter ended May 31, 2007.  The press release stated, in relevant part, as follows:

Morgan Stanley (NYSE: MS) today reported record income from continuing operations for the second quarter ended May 31, 2007 of $2,582 million, an increase of 41 percent from $1,828 million in the second quarter of 2006. Diluted earnings per share from continuing operations were a record $2.45 compared with $1.74 a year ago. Net revenues were a record $11.5 billion, 32 percent above last year's second quarter. Non-interest expenses of $7.6 billion increased 31 percent from last year.  The annualized return on average common equity from continuing operations was 27.5 percent in the current quarter, compared with 23.7 percent in the second quarter of 2006.

For the first six months of 2007, income from continuing operations was a record $5,141 million, a 50 percent increase from $3,430 million a year ago. Diluted earnings per share from continuing operations were a record $4.86 compared with $3.25 last year, net revenues rose 31 percent to a record $22.5 billion and non-interest expenses increased 24 percent to $14.8 billion.  The annualized return on average common equity from continuing operations was 28.2 percent, compared with 22.8 percent a year ago.

Net income for the quarter was $2,582 million, an increase of 40 percent from $1,841 million in the second quarter of 2006.  For the first six months of 2007, net income was a record $5,254 million, a 54 percent increase from $3,415 million a year ago.  Diluted earnings per share were $2.45 for the quarter, compared with $1.75

in the second quarter of 2006, and the annualized return on average common equity for the second quarter was 27.5 percent compared with 23.7 percent a year ago. For the first six months, diluted earnings per share were a record $4.96, compared with $3.23 a year ago, and the annualized return on average common equity was 28.7 percent compared with 22.5 percent last year.

63. Commenting on Morgan Stanley's successful second quarter, John Mack stated, in relevant part, as follows:

Morgan Stanley delivered record revenues and earnings in the second quarter and the first half of the year, as we continued to build momentum across our securities businesses and continued to see the benefits of our diverse mix of products, clients and businesses around the globe. Thanks to the commitment and focus of our people, we've now achieved seven straight quarters with ROE above 20 percent, and we're well on our way to reaching our goal of doubling 2005 earnings over five years. But we believe there is still work that remains to be done, and we remain intensely focused on delivering value to Morgan Stanley's clients and shareholders over the long term.

64. In a conference call on June 20, 2007, following the announcement of Morgan Stanley's second quarter results, Mr. Sidwell reported the following regarding Morgan Stanley's concerns regarding the subprime market:

As you've seen from our press release, we achieved record net revenues, profit before tax, income, and earnings per share from continuing operations.

We are very pleased with these results, as they reflect execution of our strategic growth plans and strong trading performance and client execution in very favorable markets. Markets were strong, and provided good opportunities. ***Concerns early in quarter about, whether issues in the subprime market were going to spread dissipated . . . .***

(Emphasis added).

65. During the conference call, Roger Freeman of Lehman Brothers questioned Mr. Sidwell about Morgan Stanley's subprime strategy in the second quarter, in relevant part, as follows:

**Roger Freeman -- Lehman Brothers**

- 24 -

[Y]ou commented how fixed income benefited last quarter from sort of favorable positioning from hedging standpoint in the mortgage area. How would you characterize your positioning in the mortgage space in the second quarter? Were you down just more as a function of declining activity in the market and some marks or was there sort of negative positioning bending the wrong way?

**David Sidwell**

The first quarter we really did benefit from the market conditions in subprime as I mentioned spreads didn't really move a whole lot during the second quarter, so there were lower opportunities. We certainly did not loose money in this business.

66.     The information disclosed in the press releases and conference calls were materially incomplete, false and misleading. Nowhere did Morgan Stanley disclose any problems with its subprime loan portfolio or its CDO hedging strategy. In reality, however, Morgan Stanley faced tremendous exposure to the subprime mortgage market. Moreover, Morgan Stanley lacked adequate internal financial controls to address the burgeoning subprime crisis and to hedge the risks associated with its CDO exposure, in spite of its repeated public announcements to the contrary.

67.     On September 19, 2007, Morgan Stanley announced its results for the third quarter ended August 31, 2007. The press release stated, in relevant part, as follows:

Morgan Stanley (NYSE: MS) today reported income from continuing operations for the third quarter ended August 31, 2007 of $1,474 million, a decrease of 7 percent from $1,588 million in the third quarter of 2006. Diluted earnings per share from continuing operations were $1.38 compared with $1.50 a year ago. Net revenues were $8.0 billion, 13 percent above last year's third quarter. Non-interest expenses of $5.7 billion increased 18 percent from last year. The annualized return on average common equity from continuing operations was 17.2 percent in the current quarter compared with 23.3 percent in the third quarter of 2006.

For the first nine months of 2007, income from continuing operations was a record $6,151 million, a 41 percent increase from $4,353 million a year ago. Diluted earnings per share from continuing operations were a record $5.79 compared with $4.12 last year. Net revenues rose 29 percent to a record $28.5 billion and non-interest expenses increased 24 percent to $19.2 billion.

The annualized return on average common equity from continuing operations was 25.5 percent compared with 22.4 percent a year ago.

The results for Discover Financial Services prior to its spin-off on June 30, 2007 are reported in discontinued operations on an after tax basis, Including these results, net income for the quarter was $1,543 million, a decrease of 17 percent from $l,851 million in the third quarter of 2006. For the first nine months of 2007, net income was a record $6,797 million, a 29 percent increase from $5,266 million a year ago. Diluted earnings per share were $1.44 for the quarter compared with $1.75 in the third quarter of 2006, and the annualized return on average common equity for the third quarter was 17.1 percent compared with 22.7 percent a year ago. For the first nine months, diluted earnings per share were a record $6.40 compared with $4.99 a year ago, and the annualized return on average common equity was 24.9 percent compared with 22.6 percent last year.

68.    Commenting on Morgan Stanley's third quarter results, Mr. Mack stated

as follows:

Morgan Stanley's diversification across businesses and regions helped us deliver ROE of 17.2% this quarter, despite the impact of the severe market disruption on some areas of the Firm -- including our credit products, leveraged lending and quantitative strategies businesses. Even with these turbulent markets, Morgan Stanley still delivered strong performances across many core businesses and achieved record results in our prime brokerage, derivatives and interest rate & currencies businesses. In addition, we continued making progress in executing our growth plans and vastly improving performance in Asset Management and Global Wealth Management.

69.    In a conference call on September 19, 2007, following the announcement of the

Morgan Stanley's third quarter results, Mr. Sidwell explained Morgan Stanley's disappointing

performance, in relevant part, as follows:

Let me highlight the areas that are key to understanding our results. *The credit markets deteriorated considerably over the course of the quarter, with increased volatility, significant spread widening, lower levels of liquidity and reduced price transparency at all parts of the capital structure. These factors affected the leveraged lending markets, the effectiveness of hedging strategies, sub-prime mortgage markets including the CDO market, as well as other structured credit products.* This credit environment significantly impacted our results in relationship and leveraged lending, and credit sales and trading.

First in relationship and leveraged lending, where markdowns to our loans and commitments led to **losses of approximately $940 million** reported in our other safes and trading net revenues. The earnings per share impact from these losses was approximately $0.33 a share. These losses include the $726 million impact of marking to market including certain fees a $31 billion pipeline of leveraged loan commitments made to support acquisitions made by financial sponsors.

Second, **corporate credit and securitized credit product sales and trading businesses, including our residential and commercial mortgage businesses, had lower revenues than the strong second quarter. Revenues were approximately $260 million this quarter, compared with $1.3 billion last quarter**, with the largest decrease in corporate credit where losses in our structured credit business, as the extreme market moves impaired the performance of hedge strategies, more than offset strong investment grade and other trading results.

Our residential and commercial mortgage business had lower revenues than the second quarter as the market continued to deteriorate, particularly in the senior portion of the capital structure. We significantly reduced our positions during the course of the quarter in light of the market continues in corporate, residential, and commercial credit.

(Emphasis added).

70.    Morgan Stanley was also suffering under the weight of massive credit deterioration necessitating enormous write-downs of its collateralized debt obligations as its Level 3 assets continued to balloon.  Level 3 assets are holdings that are so illiquid, or trade so infrequently, that they lack a reliable price, so their valuations are based on management's best guess.  Regarding Morgan Stanley's Level 3 assets, Mr. Sidwell commented, in relevant part, as follows:

Given the third quarter market dynamics, more instruments have become illiquid and as you would expect, the level of financial assets categorized in Level 3, which is the most illiquid category, have increased. Our total asset position of Level 3 in the second quarter was approximately 5% of our total assets. Level 3 liabilities represented approximately 2% of total liabilities.

**While we are still working on the third quarter disclosures, we anticipate that the total of Level 3 asset positions will increase to approximately 8% of total assets when we file our Q**.   Of the increase, approximately one-fourth or one-quarter represents Level

2 assets moving into the Level 3 category. Level 3 liabilities will represent about 3% of total liabilities.

***The major components of Level 3 are the same as we disclosed in the second quarter. Corporate and other debt, derivatives -- which 13 primarily complex structured instruments -- and investments which includes real estate funds and private equity***. Corporate and other debt in the assets category includes closed leveraged acquisition finance loans, commercial and residential whole loans to be securitized, commercial whole loans for private placements, and mortgage-backed residuals. Corporate and other debt in the liability category includes the marking to market of our pipeline of leveraged loan commitments.

Turning to the income statement on page 44 of last quarter's Q, you saw that we recognized just under $600 million in gains on Level 3 assets and liabilities. When we report our 10-Q for this quarter, you will see a net increase in gains in Level 3 driven by derivative contracts, which offset losses on other cash instruments included in those classified within Level 1 and 2.

Level 3 is where there are unobservable inputs, and includes situations where there is little if any market activity for the asset or liability. This is, generally speaking, the category where we are marking to model. The valuation methodology on these illiquid instruments applies modeling techniques that use relevant empirical data, including available indices to extrapolate an estimated fair value. The input reflects assumptions that market participants use in pricing an asset or liability in a current transaction. Representing a determined exit price, and also the cash flows ultimately expected.

Our valuation models are calibrated to the market on a frequent basis. The parameters and inputs are adjusted for assumptions about risk, and in all cases if market data exists, that data will be used to price the assets or liabilities. The valuation of these instruments are reviewed by an independent valuation group outside of the business units and subject to the scrutiny of our auditors so we are confident that we have appropriately valued these positions.

(Emphasis added).

71.    During its third quarter, Morgan Stanley took approximately $1.2 billion in write-downs related to leveraged loans, but had yet to take any subprime mortgage-related write-downs. Most of the other investment banks had already taken billions of dollars in write downs related to the weakening market. Citigroup Inc., for example, which took more than $6 billion in write-downs in the third quarter, announced its plan to take an additional $8 billion to $11 billion

in the fourth quarter. Morgan Stanley's silence regarding its subprime exposure led the market to

speculate that Morgan Stanley had gone relatively unscathed in the subprime mortgage mess.

Accordingly, analysts questioned Morgan Stanley about Morgan Stanley's exposure to the

subprime mortgage markets and its CDO positions during the September 19 conference call, as

follows:

### Michael Hecht - Banc of America Securities

The marks you mentioned on the credit side of the business more coming from the corporate side versus the mortgage side, which I think was included in credit and on the mortgage side any write-downs related to Saxon?

### David Sidwell

Obviously we look at our residential and commercial mortgage business as a total business, and so Saxon is now integrated very much as we think about our residential mortgage business.  As I said overall, that business had positive revenues.  To answer in a very technical manner, there was an impairment of our goodwill in the quarter on Saxon.  There was no impairment because we evaluate goodwill at the fixed income level, not at the Saxon level. There was a slight impairment of the intangible assets that was very small.

### Michael Hecht -- Bank of America Securities

Can you clarify for us what your exposure is to ABCP Conduits? I think there is some rating agencies out there that put your liquidity lines at relatively big numbers, and I was hoping for a little clarification there.

### Cohn Kelleher

We have ABCP Conduits as such, in terms of providing stand-bys, we have negligible exposure. In terms of investment management we act basically in ABCP as an arranger and placer of paper.  As you know, that market actually is showing signs of life and issuance is coming back.

Within investment management we clearly, like everybody, hold a commercial paper issued by the Conduits, and some of the SIVs; not surprising, given that the outstanding of that market was $1.2 trillion out of $2.2 trillion, and you know that position has been significantly reduced.  We stopped buying that paper rolling it over early on, and we feel pretty relaxed about the positions we hold there for the time being.

### David Sidwell

We were given a bit of a note here too that the rating agencies
seem to have a wrong number for us here, so as Colm said, we do
not think we have a significant number.

72.     Following the earnings conference, on October 11, 2007, Morgan Stanley

announced that Mr. Kelleher would take over for Sidwell as the Executive Vice President and

Chief Financial Officer of Morgan Stanley.

73.     Despite Morgan Stanley's silence regarding its exposure to the subprime crisis,

the Wall Street Journal published an article on November 7, 2007, revealing that two analysts --

David Trone of Fox-Pitt, Kelton and Mike Mayo of Deutsche Bank AG -- projected a range of

$3 billion to $6 billion on a possible Morgan Stanley write-down.  Mr. Trone characterized the

basis for his Morgan Stanley estimate as an "educated guesses" tied to the firm's disclosed levels

of credit and real-estate exposure.  He estimated the firm's exposure to CDOs is about $16

billion and that the write-downs are likely to total 25% of its CDO exposures, or $4 billion.  He

also said the firm could take an additional $2 billion hit on straight mortgages and other risks

such as exposure to SIVs, or structured investment vehicles.

74.     In a late reporting, on November 7, 2007, Morgan Stanley announced that it

would write-down the value of its subprime mortgage-related exposure by $3.7 billion, due to the

"continued market deterioration" since August.   Morgan Stanley attributed the loss to

deterioration in capital markets, which was triggered in large part by the struggles of thousands

of homeowners to keep up with mortgage payments.  Morgan Stanley further explained that the

actual hit to its fourth-quarter results will depend on future market developments and could differ

from the amount noted.  "It is expected that market conditions will continue to evolve, and that

the fair value of these exposures will frequently change and could further deteriorate," Morgan

Stanley said.

75.    The biggest piece of the $3.7 billion in pretax paper losses, Morgan Stanley's data indicated, came from a write-down of the CDO position from $11.4 billion on August 28 to $8.3 billion on October 31.  Such securities fell as much as 4.4% in August and 4.5% in September, but tumbled as much as 27% in October.  Mr. Kelleher noted that the mortgage-related bets "did not come out of our client-facing activities" such as underwriting; rather, Morgan Stanley "began with a short position in the subprime asset class, which went right through to the first quarter." As the downturn spread to the senior CDO holdings that were meant to hedge the subprime bet, Morgan Stanley's exposure changed "from short to flat to long."  According to Mr. Kelleher, "[y]ou go short, expecting a certain predefined range of losses . . . that range of losses was burnt through by the excessive market action.   And then you ended up effectively going long."  One of Morgan Stanley's problems with its residential exposure in recent months was the weakening of its hedging positions as the market plunged far deeper than risk-management models had predicted, explained Mr. Kelleher.

76.    Through the first nine months of the fiscal year that ended in August, Morgan Stanley's bearish hedge on subprime returned a profit of $1 billion, according to Goldman Sachs Group Inc. analyst William Tanona.   But the firm's disclosure of the paper losses and its remaining positions in early November prompted two ratings firms to issue negative outlooks for Morgan Stanley's credit.

77.    Speculation by investors that Morgan Stanley had gone relatively unscathed in the subprime mortgage mess was immediately dashed and the gravity of the situation weighed on the stock, contributing to the eventual broad sell-off in the market.

78.    Standard & Poor's ("S&P") changed its outlook on Morgan Stanley to negative from stable after the bank said it will write down $3.7 billion in securities backed by residential mortgages.   A negative outlook indicates that a ratings cut is likely over the next two years. S&P rates Morgan Stanley's senior unsecured debt "AA-minus," the fourth-highest investment grade. Fitch Ratings also affirmed its ratings of "AA-minus" on the bank, saying the loss is manageable. Fitch has a negative outlook on Morgan Stanley.

79.    The loss is a result of increased risk-taking in proprietary trading at the bank, S&P said in a statement.   "This misstep points to the increased risk Morgan Stanley bears owing to management's growth strategy and, more broadly, increased trading risks for all the broker-dealers in the current environment," S&P said.

80.    Moody's Investors Service also cut the ratings on 86 classes of Morgan Stanley mortgage securities while placing another 37 tranches under review on November 9, 2007. "The ratings were downgraded and placed under review for downgrade based on higher than anticipated rates of delinquency, foreclosure, and REO in the underlying collateral relative to credit enhancement levels," Moody's said in a release.   The collateral backing the deals consists of first lien fixed and adjustable-rate, Alt-A mortgage loans which were originated in late 2005 though 2006, it said.

81.    Although John Mack remains committed to taking more risk in trading, investing and lending for the firm and its clients, the ongoing credit markets crunch is making its mark on Morgan Stanley's balance sheet.   "Clearly there is a risk of contagion" from residential to commercial mortgage-backed securities, Mr. Kelleher said. "The trend is clearly not looking good . . . ."

82.     On November 13, 2007, Morgan Stanley held a conference in which it noted that it expects revenue and common equity growth to decline in 2008 amid a more challenging environment.  "While we expect 2008 to be another growth year, we do not expect the current growth trajectory in revenue and average common equity to continue," Mr. Kelleher said at the Merrill Lynch Banking and Financial Services conference.  "We plan to be more judicious in how we allocate capital, to ensure the highest risk-return in this environment," he said. According to Mr. Kelleher, Morgan Stanley intends to "bring down" its balance sheet to keep leverage levels on par with previous quarter.  Mr. Kelleher also said that Morgan Stanley expects "the market to take longer, several quarters, to return to more normal operating levels."  Demand for CDOs will remain muted, hobbling the structured finance business "for an extended period."

## THE LAW UNDER ERISA

83.     ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

84.     ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

85.     ERISA § 404(a)(l)(A) and (B), 29 U.S.C. § 1104(a)(l)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the Participants and beneficiaries, for the exclusive purpose of providing benefits to Participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

86.     These fiduciary duties under ERISA § 404(a)(l)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence, and are the "highest known to the law."  They entail, among other things:

(a)     The duty to conduct an independent and thorough investigation into, and continually to monitor, the merits of all the investment alternatives of a plan, including in this instance the Plan, which invested in MS&Co. Stock, to ensure that each investment is a suitable option for the Plan;

(b)     The duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with an "eye single" to the interests of the Participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the Plan's sponsor; and

(c)     A duty to disclose and inform, which encompasses: (i) a negative duty not to misinform; (ii) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (iii) a duty to convey complete and accurate information material to the circumstances of Participants and beneficiaries.

87.     ERISA § 405(a), 29 U.S.C. § 1105(a), "Liability for breach by co-fiduciary," provides, in pertinent part, that ". . . [i]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (2) if, by his failure to comply with section 404(a)(l), 29 U.S.C. § 1104(a)(l), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach."

88.     Plaintiffs therefore bring this action under the authority of ERISA § 502(a)(2) for Plan-wide relief under ERISA § 409(a) to recover losses sustained by the Plan arising out of the breaches of fiduciary duties by Defendants for violations under ERISA § 404(a)(l) and ERISA § 405(a).

## DEFENDANTS' FIDUCIARY STATUS

89.     ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." § 402(a)(l), 29 U.S.C. § 1102(a)(l).

90.     During the Class Period, all of Defendants acted as fiduciaries of the Plan pursuant to § 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A) and the law interpreting that section. As outlined herein, Defendants all had discretionary authority and control with respect to the

management of the Plan and/or the management or disposition of the Plan's investments and assets, and/or had discretionary authority or responsibility for the administration of the Plan.

91.     During the Class Period, Defendants' direct and indirect communications with the Plan's Participants included statements regarding investments in Company Stock. Upon information and belief, these communications included, but were not limited to, SEC filings, annual reports, press releases, Company presentations made available to the Plan's Participants via the Company's website and Plan-related documents which incorporated and/or reiterated these statements. Defendants also acted as fiduciaries to the extent of this activity.

92.     In addition, under ERISA, in various circumstances, non-fiduciaries who knowingly participate in fiduciary breaches may themselves be liable.  To the extent any of the Defendants are held not to be fiduciaries, they remain liable as non-fiduciaries who knowingly participated in the breaches of fiduciary duty described below.


### CAUSES OF ACTION

### COUNT I

**Failure to Prudently and Loyally Manage the Plan's Assets**
**(Breaches of Fiduciary Duties in Violation of ERISA § 404 by All Defendants)**

93.     Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

94.     At all relevant times, as alleged above, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

95.    As alleged above, Defendants were responsible, in different ways and to differing extents, for the selection and monitoring of the Plan's investment options, including the option of Company Stock.

96.    Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that investment options made available to participants under a plan are prudent.  Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested. Defendants were responsible for ensuring that all investments in MS&Co. Stock in the Plan were prudent and that such investment was consistent with the purpose of the Plan.  Defendants are therefore liable for losses incurred as a result of such investments being imprudent.

97.    A fiduciary's duty of loyalty and prudence requires it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries.  ERISA § 404(a)(l)(D), 29 U.S.C. § 1104(a)(l)(D).  Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor may it allow others, including those whom they direct or who are directed by the plan, including plan trustees, to do so.

98.    Moreover, during the Class Period, despite their knowledge of the imprudence of the investment, Defendants failed to take any meaningful steps to prevent the Plan, and indirectly the Plan's Participants and beneficiaries, from suffering losses as a result of the Plan's investment in MS&Co. Stock.  Further, given that such a high concentration of the assets of the Plan was invested in the stock of a single company (MS&Co.), Defendants were obliged to have

in place some financial strategy to address the extreme volatility of single equity investments. All categories of Defendants failed to implement any such strategy.

99. The fiduciary duty of loyalty also entails a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with single-minded devotion to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

100. Defendants breached their co-fiduciary obligations by, among their other failures: knowingly participating in, or knowingly undertaking to conceal, the failure to prudently and loyally manage the Plan's assets with respect to offering Company Stock as an investment option in the Plan; enabling Defendants' failure to prudently manage the Plan's assets with respect to the Plan's investments; and, having knowledge of the failure to prudently manage the Plan's assets, yet not making any effort to remedy the breach.

101. Specifically, at least some of the Defendants had actual knowledge of MS&Co.'s corporate malfeasance and questionable reporting and business. In addition, in light of their high-ranking positions as high ranking officers at the Company, Director Defendants had/should have had constructive knowledge of these activities.

102. Despite this knowledge, Defendants participated in each other's failures to prudently manage the Plan's assets and knowingly concealed such failures by not informing Participants that the Plan's holdings of MS&Co. Stock were not being prudently managed. They also failed to remedy their mutual breaches of the duty to prudently manage the Plan's investment in MS&Co. Stock, despite inarguably having knowledge of such breaches.

103.    Furthermore, through their own failure to prudently and loyally manage the Plan's investment in MS&Co. Stock, or to undertake any genuine effort to investigate the merits of such investment, or to ensure that other fiduciaries were doing so, Defendants named in this Count enabled their co-fiduciaries to breach their own independent duty to prudently and loyally manage the Plan's investment in MS&Co. Stock.

104.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiffs and the Plan's other Participants and beneficiaries, lost a significant portion of their investments meant to help Participants save for retirement Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT II

### Failure to Provide Complete and Accurate Information to Participants and Beneficiaries (Breaches of Fiduciary Duties in Violation of ERISA § 404 by All Defendants)

105.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

106.    At all relevant times, as alleged above, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

107.    As alleged above, the scope of Defendants' fiduciary duties and responsibilities included disseminating Plan documents and information to Participants regarding the Plan and assets of the Plan.  In addition, Defendants had a duty to provide Participants with information they possessed that they knew or should have known, would have an extreme impact on the Plan.

108.    The duty of loyalty under ERISA requires fiduciaries to speak truthfully to Participants, not to mislead them regarding the Plan or the Plan's assets, and to disclose information that Participants need in order to exercise their rights and interests under the Plan. This duty to inform Participants includes an obligation to provide Participants and beneficiaries of the Plan with complete and accurate information, and to refrain from providing false information or concealing material information regarding the Plan's investment options such that Participants can make informed decisions with regard to investment options available under the Plan, this duty applies to all of the Plan's investment options, including investment in MS&Co. Stock.

109.    Because a substantial percentage of the Plan's assets were invested in MS&Co. Stock, and Defendants chose to invest overwhelmingly in MS&Co. Stock, such investment carried with it an inherently high degree of risk.  This inherent risk made Defendants' duty to provide complete and accurate information particularly important with respect to Company Stock.

110.    Specifically, MS&Co., through its officers and directors issued a multitude of false and misleading statements through SEC filings and press releases regarding value of MS&Co. Stock and the financial health of the Company.

111.    Upon information and belief, such communications were disseminated directly to all Participants, which incorporated by reference the Company's materially misleading and inaccurate SEC filings and reports furnished by MS&Co., through its officers and Director Defendants.  In addition, upon information and belief, the Company communicated directly with all Participants regarding the merits of investing in MS&Co. Stock in company-wide and

uniform communications, and, yet, in the context of such communications failed to provide complete and accurate information regarding MS&Co. Stock as required by ERISA.

112.    In addition, Defendants were responsible for providing Participants in the Plan with investment education and communication.  Defendants, however, failed to disclose any information to Plan Participants regarding MS&Co.'s deceitful business practices and how these activities adversely affected Company stock as a prudent investment option under the Plan. Defendants thus breached their duty to provide Participants with complete and accurate information necessary for making informed investment decisions with regard to investment options under the Plan.

113.    Defendants named in this Count breached their duty to inform Participants by failing to provide complete and accurate information regarding MS&Co. Stock, making material misrepresentations about the Company's financial condition, and, generally, by conveying inaccurate information regarding the soundness of MS&Co. Stock and the prudence of investing retirement contributions in the Company's stock.

114.    These failures were particularly devastating to the Plan and the Participants, as a significant percentage of the Plan's assets were invested in MS&Co. Stock during the Class Period and, thus, the stock's precipitous decline had an enormous impact on the value of Participants' retirement assets.

115.    In addition, MS&Co. and the other Defendants named in this Count knew or should have known that information they possessed regarding the true condition of MS&Co. would have an extreme impact on the Plan.  Yet, in violation of their fiduciary duties, these Defendants failed to provide Participants with this crucial information.

116.     As a consequence of the failure of Defendants named in this Count to satisfy their disclosure obligations under ERISA, Participants lacked sufficient information to make informed choices regarding investment of their retirement savings in MS&Co. Stock, or to appreciate that under the circumstances known to the fiduciaries, but not known by Participants, MS&Co. Stock was an inherently unsuitable and inappropriate investment option for their Plan accounts.  Had accurate information been provided, Participants could have protected themselves against losses accordingly, and consequently, Participants relied to their detriment on the incomplete and inaccurate information provided by Defendants in their fiduciary communications and failures thereof.

117.     As a consequence of Defendants' breaches of fiduciary duty alleged in this Count, the Plan suffered tremendous losses.  If these Defendants had discharged their fiduciary duties to prudently invest the Plan's assets, the losses suffered by the Plan would have been minimized or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary and co-fiduciary duties alleged herein, the Plan, and indirectly Plaintiffs and the other Class members, lost millions of dollars of retirement savings.

118.     Pursuant to ERISA §§ 409 and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## COUNT III

**Failure to Monitor Appointed Plan Fiduciaries and Provide
Them with Accurate Information (Breaches of Fiduciary Duties in
Violation of ERISA § 404 by MS&Co. and the Board of Directors)**

119.     Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

120.    At all relevant times, as alleged above, MS&Co. and the Director Defendants named in this Count were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).  At all relevant times, as alleged above, the scope of the fiduciary responsibilities of MS&Co. and the Director Defendants named in this Count included the responsibility to appoint, evaluate, and monitor other fiduciaries.  The duty to monitor entails both giving information to and reviewing the actions of the monitored fiduciaries. The monitoring fiduciaries, MS&Co. and the Director Defendants named in this Count, had the duty to:

(a)    Ensure that the appointed Plan fiduciaries possess the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties. They must be knowledgeable about the operations of the Plan, the goals of the Plan, as noted above, and the behavior of the Plan's Participants;

(b)    Ensure that the appointed Plan fiduciaries are provided with adequate financial resources to do their job;

(c)    Ensure that the appointed Plan fiduciaries have adequate information to do their job of overseeing the Plan's investments;

(d)    Ensure that the appointed Plan fiduciaries have ready access to outside, impartial advisors when needed;

(e)    Ensure that the appointed Plan fiduciaries maintain adequate records of the information on which they base their decisions and analysis with respect to the Plan's investment options; and

(f)     Ensure that the appointed Plan fiduciaries report regularly to the Company, the Company must then review, understand, and approve the conduct of the hands-on fiduciaries.

121.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.   In addition, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan and the plan assets.

122.    MS&Co. and the Director Defendants named in this Count breached their fiduciary monitoring duties by, among other things, (a) failing to ensure that the appointed Plan fiduciaries were given adequate information about the Company's business problems alleged above, which made Company Stock an imprudent investment, which was necessary for them to perform their duties of overseeing the Plan's investments, and (b) failing to ensure that the monitored fiduciaries completely appreciated the huge risk of significant investment by rank and file employees in an undiversified employer stock fund which was made up primarily of Company Stock, an investment that was imprudent and inherently subject to significant downward movements, especially here where the stock was artificially inflated by non-public corporate malfeasance and illicit activities.

123.    MS&Co. and Director Defendants also breached this duty by not properly disclosing information, that they knew or should have known, about the Company's improper

business practices to the Trustee. The Trustee is responsible for investing and managing assets of the Plan. However, in doing so, the Trustee shall be subject to the direction and guidance of MS&Co.

124. MS&Co. and the other Defendants named in this Count, knew or should have known that the fiduciaries they were responsible for monitoring were (a) imprudently allowing the Plan to continue offering MS&Co. Stock as an investment alternative for the Plan, and (b) continuing to invest the assets of the Plan in MS&Co. Stock when it no longer was prudent to do so. Despite this knowledge, MS&Co. and the Director Defendants named in this Count failed to take action to protect the Plan, and concomitantly the Plan's Participants, from the consequences of these fiduciaries' failures.

125. MS&Co. and the Director Defendants named in this Count are liable as co-fiduciaries because they knowingly participated in each other's fiduciary breaches as well as those by the appointed Plan fiduciaries, they enabled the breaches by these Defendants, and they failed to make any effort to remedy these breaches, despite having knowledge of them.

126. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly the Plaintiffs and the Plan's other Participants and beneficiaries, lost a significant portion of their investments meant to help Participants save for retirement.

127. Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C., § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

**COUNT IV**

**Breach of Duty to Avoid Conflicts of Interest**
**(Breaches of Fiduciary Duties in Violation of**
**ERISA §§ 404 and 405 by All Defendants)**

128.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

129.    At all relevant times, as alleged above, all Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

130.    ERISA § 404(a)(l)(A), 29 U.S.C. § 1104(a)(l)(A), imposes on a plan fiduciary a duty of loyalty, that is, a duty to discharge his/her duties with respect to a plan solely in the interest of the Participants and beneficiaries and for the exclusive purpose of providing benefits to Participants and beneficiaries.

131.    Given the allegations listed above, Defendants clearly placed the interests of themselves and the Company, as evidenced by the longstanding artificial inflation of Company Stock, before the interests of the Plan and its Participants and beneficiaries.  These conflicts of interest put Defendants in the inherently problematic position of having to choose between their own interests as directors, officers, executives (and MS&Co. stockholders), and the interests of the Plan's Participants and beneficiaries, in whose interests Defendants were obligated to loyally serve with an "eye single."

132.    Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia*: failing to engage independent fiduciaries who could make independent judgments concerning the Plan's investment in MS&Co. Stock; failing to notify appropriate federal agencies, including the SEC of the facts and transactions which made MS&Co. Stock an unsuitable investment for the Plan; failing to take such other steps as were

necessary to ensure that Participants' interests were loyally and prudently served; with respect to each of these above failures, doing so in order to prevent drawing attention to the Company's inappropriate practices; and by otherwise placing the interests of the Company and themselves above the interests of the Participants with respect to the Plan's investment in Company Stock.

133.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT V

### Co-Fiduciary Liability
### (Breaches of Fiduciary Duties in Violation of ERISA § 405 by All Defendants)

134.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

135.    ERISA § 405(a), 29 U.S.C. § 1105, imposes liability on a fiduciary, in addition to any liability which he may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if (a) he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (b) he fails to comply with § 1104(a)(l) in the administration of his specific responsibilities which give rise to his status as a fiduciary, by enabling such other fiduciary to commit a breach; or (c) he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

136.    As alleged herein, MS&Co., through its officers and employees withheld material information from the Plan's Participants and provided misleading disclosures, by the conduct set forth above, and profited from such practices, and, thus, knowledge of such practices is imputed

to these Defendants as a matter of law.  In addition, as alleged herein on information and belief, MS&Co. and the other Defendants named in this Count participated in and/or knew about the Company's misrepresentations regarding the Company's financial condition.    Thus, these Defendants as well had knowledge at all relevant times of the factual matters pertaining to the imprudence of MS&Co. Stock as an investment for the Participants' retirement assets.

137.    Despite this knowledge, Defendants named in this Count knowingly participated in their co-fiduciaries' failures to prudently and loyally manage the Plan's investment and holding of MS&Co. Stock during the Class Period.    They did so by themselves making imprudent and disloyal decisions respecting the Plan's investment in MS&Co. Stock in the manner alleged herein in violation of ERISA § 405(a)(l)(A).  In addition, these same Defendants failed to undertake any effort to remedy their co-fiduciaries' and one-another's failures to prudently and loyally manage the Plan's investment in MS&Co. Stock despite knowing such failures were breaches of fiduciary duty under ERISA. Instead, they allowed the harm to continue and contributed to it throughout the Class Period in violation of ERISA § 405(a)(l)(C).

138.    In further violation of ERISA § 405(a)(l)(C), Defendants named in this Count also knew that inaccurate and incomplete information had been provided to Participants, yet, they failed to undertake any effort to remedy this breach by ensuring that accurate disclosures were made to Participants and the market as a whole.  Instead, they compounded the problem by downplaying the significance of MS&Co.'s problems and further concealing such practices from Participants and the market as a whole.

139.    In addition, Defendants named in this Count enabled the imprudent asset management decisions of any and all other Defendant -- including any appointed Plan fiduciaries

-- who lacked knowledge of the circumstances rendering the stock imprudent, by failing to provide such persons with complete and accurate information regarding the stock, or to the extent all such persons possessed the information, by failing to ensure that they appreciated the true risks to the Plan caused by the Company's improper practices, so that these other Defendants could effectively discharge their obligation to prudently and loyally manage the Plan's investment in MS&Co. Stock. In so doing, these Defendants breached ERISA § 405(a)(l)(B).

140. Further, through their failure to properly and effectively monitor and remove those fiduciaries whose performance was inadequate as alleged above, Defendants named in this Count enabled these appointed Plan fiduciaries' imprudent management of the MS&Co. Stock in the Plan.

141. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiffs and the Plan's other Participants and beneficiaries, lost a significant portion of their retirement investment.

142. Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT VI

**Knowing Participation in a Breach of Fiduciary Duty**
**(Breaches of Fiduciary Duties in Violation of**
**ERISA §§ 404 and 502(a)(3) by MS&Co.)**

143. Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

144.    To the extent that MS&Co. is found not to have been a fiduciary or to have acted in a fiduciary capacity with respect to the conduct alleged to have violated ERISA, MS&Co. knowingly participated in the breaches of those Defendants who were fiduciaries and acted in a fiduciary capacity and as such is liable for equitable relief as a result of participating in such breaches.

145.    MS&Co. benefited from the breaches by discharging its obligations to make contributions to the Plan in amounts specified by contributing MS&Co. Stock to the Plan while the value of the stock was inflated as the result of the breaches of fiduciary duty alleged herein and as a result of MS&Co. providing the market with materially misleading statements and omissions.  Accordingly, MS&Co. may be required to disgorge this benefit or a constructive trust should be imposed on treasury shares of MS&Co. Stock which would have been contributed to the Plan, but for MS&Co.'s participation in the foregoing breaches of fiduciary duty.

## CAUSATION

146.    The Plan suffered millions of dollars in losses in plan benefits because substantial assets of the Plan were imprudently invested or allowed to be invested by Defendants in MS&Co. Stock during the Class Period, in breach of Defendants' fiduciary duties.  These losses to the Plan were reflected in the diminished account balances of the Plan's Participants.

147.    Defendants are responsible for losses in Plan benefits caused by the Participants' direction of investment in MS&Co. Stock, because Defendants failed to take the necessary and required steps to ensure effective and informed independent participant control over the

investment decision-making process, as required by ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated thereunder. Defendants concealed material, non-public facts from Participants, and provided inaccurate, incomplete and materially misleading information to them regarding the true health and ongoing profitability of the Company, thereby misrepresenting the Company's soundness as an investment vehicle. As a consequence, Participants could not exercise independent control over their investments in MS&Co. Stock, and Defendants remain liable under ERISA for losses caused by such investment.

148.    Defendants are also responsible for all losses in Plan benefits caused by the investment of the Plan's Company Contributions in MS&Co. Stock during the Class Period, as Defendants controlled the investment, and the investment was imprudent.

149.    Had Defendants properly discharged their fiduciary and/or co-fiduciary duties, including the provision of full and accurate disclosure of material facts concerning investment in MS&Co. Stock, eliminating such Company Stock as an investment alternative when it became imprudent, and divesting the Plan from its holdings of MS&Co. Stock when maintaining such an investment became imprudent, the Plan would have avoided a substantial portion of the losses that it suffered.

150.    Also, reliance is presumed in an ERISA breach of fiduciary duty case. Nevertheless, to the extent that reliance is an element of the claim, Plaintiffs relied to their detriment on the misstatements and omissions that Defendants made to Plan Participants.

## REMEDY FOR BREACHES OF FIDUCIARY DUTY

151.    Defendants breached their fiduciary duties in that they knew or should have known the facts as alleged above, and therefore knew or should have known that the Plan's

assets should not have been invested in MS&Co. Stock during the Class Period.  As a consequence of Defendants' breaches, the Plan suffered significant losses.

152.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109.  Section 409 requires "any person who is a fiduciary. . . who breaches any of the . . . duties imposed upon fiduciaries . . . . to make good to such plan any losses to the plan . . . ."  Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate . . . ."

153.    With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the Participants and beneficiaries in the plan would not have made or maintained their investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available.  In this way, the remedy restores the values of the Plan's assets to what they would have been if the Plan had been, properly administered.

154.    Plaintiffs and the Class are therefore entitled to relief from Defendants in the form of: (a) a monetary payment to the Plan to make good to the Plan the losses to the Plan resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (b) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a)(2-3), 29 U.S.C. §§ 1109(a) and 1132(a)(2-3); (c) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the

common fund doctrine, and other applicable law; (d) taxable costs; (e) interest on these amounts, as provided by law; and (f) such other legal or equitable relief as may be just and proper.

155.    Under ERISA, each Defendant is jointly and severally liable for the losses suffered by the Plan in this case.

## ERISA SECTION 404(c) DEFENSE INAPPLICABLE

156.    ERISA § 404(c) is an affirmative defense that provides a limited exception to fiduciary liability for losses that result from Participants' exercise of control over investment decisions.  In order for § 404(c) to apply, Participants must in fact exercise "independent control" over investment decisions, and the fiduciaries must otherwise satisfy the procedural and substantive requirements of ERISA § 404(c), 29 U.S.C. § 1104(c) and the regulations promulgated under it.

157.    Those provisions were not complied with here as, among other reasons, instead of taking the necessary steps to ensure effective participant control by complete and accurate material information disclosure, Defendants did exactly the opposite.  As a consequence, Participants in the Plan did not have informed control over the portion of the Plan's assets that were invested in MS&Co. Stock as a result of their investment directions, and Defendants remained entirely responsible for losses that result from such investment.

158.    Because ERISA § 404(c) does not apply here, Defendants' liability to the Plan, the Plaintiffs and the Class for relief stemming from Participants' decisions to invest contributions in MS&Co. Stock is established upon proof that such investments were or became imprudent and resulted in losses in the value of the assets in the Plan during the Class Period.

159.    Furthermore, under ERISA, fiduciaries -- not Participants -- exercise control over the selection of investment options made available to Participants.    Thus, whether or not Participants are provided with the ability to select among different investment options, and whether or not Participants exercised effective control over their investment decisions (which was not the case here), liability attaches to the fiduciaries if an imprudent investment is selected by the fiduciaries and presented as an option to Participants, and as a result of such action the Plan suffers a loss.    Because this is precisely what occurred in this case, Defendants are liable for the losses incurred by the Plan.

160.    Finally, Defendants remain liable for Plan losses that pertain to MS&Co. Stock acquired by the Plan with employer contributions, as Participants did not exercise any control.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs prays for:

A.    A Declaration that Defendants, and each of them, have breached their ERISA fiduciary duties to the Participants;

B.    A Declaration that Defendants, and each of them, are not entitled to the protection of ERISA § 404(c)(l)(B), 29 U.S.C. § 1104(c)(l)(B);

C.    An Order compelling Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the Participants would have made if Defendants had fulfilled their fiduciary obligations;

D.    Imposition of a Constructive Trust on any amounts by which any

Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

E.      An Order enjoining Defendants, and each of them, from any further violations of their ERISA fiduciary obligations;

F.      An Order requiring Defendants to appoint one or more independent fiduciaries to participate in the management of the Plan's investment in MS&Co. Stock;

G.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the Participants' individual accounts as benefits due in proportion to the accounts' diminution in value;

H.      An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

I.      An Order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

J.      An Order for equitable restitution and other appropriate equitable monetary relief against Defendants.


Dated:  February 5, 2008

**GAINEY & McKENNA**

<u>S/</u>
Thomas J. McKenna
295 Madison Avenue
New York, NY 10017
Tel: (212) 983-1300
Fax: (212) 983-0383
Email: tjmckenna@gaineyandmckenna.com

*Attorneys for Plaintiffs*